## Grant v. Commonwealth.

(Decided September 30, 1927.)

Appeal from Kenton Circuit Court
(Criminal, Common Law and Equity Division).

Homicide.—An instruction in a homicide case, to the effect that the defendant's right to protect himself depended not on the danger which the jury might believe him to have been in at the time of his killing, but upon the danger defendant, in the exercise of reasonable judgment, believed to be imminent, held proper.

JOSEPH C. HEALY for appellant.

FRANK E. DAUGHERTY, Attorney General, and ULIE J. HOWARD for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER—Affirming.

Thomas Grant, a colored man, upon his trial for the murder of Edward Crockett, another negro, was found guilty of manslaughter, and his punishment fixed at confinement in the penitentiary for 10 years. Crockett was a horse trainer, and for about 15 years had been in the employment of Mr. Frank Tyler, who is the owner and

trainer of race horses. His services with Mr. Tyler took Crockett over a large part of America and a portion of Canada. On one of these trips, in 1925, he met Thomas Grant, whose home is in the city of St. Catherine, in the province of Ontario. They became friends. Grant was a groomer of horses, and secured employment with Tyler, and thus he and Crockett were thrown together. This friendship continued. The two usually ate and lived together. Mr. Tyler, in the winter of 1926-27, kept his horses in some stables appurtenant to the Latonia race track, and Crockett had a small house near the stable, consisting of two rooms, one on the lower floor wherein they cooked and ate, and one on the second floor wherein Crockett slept. He and Grant cooked and ate together, and Grant slept in a portion of the stable.

Crockett was not in very good health, and a brother of his, who lived in Latonia, had been there and had helped Crockett do his work on Friday, January 7. He returned the next afternoon about 3 o'clock and could not find Crockett, but found locked this little house in which Crockett lived. He learned on inquiry that no one had seen Crockett that day. He broke the lock and entered. He found Crockett in the lower room, dead, with a blanket over him, and with his skull crushed and a crowbar under his body. The police were notified, and they began to look for Thomas Grant. They found him drunk in a nearbly stall. He had on an overcoat belonging to the dead man. He had a watch, chain and fob, two rings, and some keys that belonged to the dead man.

Mr. Tyler testified that about 10:30 on the morning of January 8, he saw Grant; that Grant was drunk, and told him he was in serious trouble, that he had killed a man and wanted to borrow $20. He did not lend him the money, and paid no further attention to him. This is the substance of the evidence for the commonwealth.

Grant took the stand and gave this account of the matter: On the 5th of January, Crockett had given him some money with which to make a bet on a race horse, and on the 7th he had learned that the horse had won, and he asked Grant for the winnings. Grant claimed he had not collected the bet, and they had some words about the matter. Grant says he then collected the bet and paid Crockett. When he did so, he tried to purchase some liquor. Crockett asked him $1 for a half pint. Grant told him he could get plenty of liquor at 75 cents a half pint,

but Crockett began to praise his liquor and Grant descanted upon the potency and potability of the 75 cent liquor. The argument about the virtue of the two liquors became heated. One word brought on another, so Grant says, and Crockett got mad and grabbed a butcher knife off the table and rushed at Grant. Grant says he grabbed the first thing he could get, which was this crowbar, and struck him with it, that it killed him, and that this was about 6 o'clock on the evening of January 7. He said he knew nothing about the rings, but admitted having the overcoat, watch, chain, and keys, but claimed they were his keys which he had allowed Crockett to carry. Thus we see that he admitted killing Crockett, but his contention is that he had to do so in his necessary self-defense. This is the substance of the evidence.

He filed five grounds for a new trial, but has abandoned all of them but one. His counsel, in his brief, has attacked with vigor and ability the self-defense instruction which was given, and which we have carefully examined. The instruction given is almost identical in form with the instruction approved in the case of Mullins v. Commonwealth, 108 S. W. 252, 32 Ky. Law Rep. 1216. It also compares favorably with the instruction prepared by this court in the case of Wagner v. Commonwealth, 108 S. W. 318, 32 Ky. Law Rep. 1185, and with the one prepared in the case of Wilson v. Commonwealth (Ky.), 121 S. W. 430, as well as with the instruction 3 which was given and approved by this court in the case of Hocker v. Commonwealth, 111 S. W. 676, 33 Ky. Law Rep. 944. Indeed, the instruction here given may be said to be a stereotyped instruction, and it fully presented the defendant's right to defend himself. He cites a number of cases wherein judgments were reversed because the self-defense instruction given in them left to the jury the real or apparent danger of the defendant at the time, whereas a man's right to defend himself depends not on the danger which the jury may believe him to have been in at the time, but upon danger which the defendant, in the exercise of a reasonable judgment, then believed to be imminent. The instruction given provided that, if "he (the defendant) believed and had reasonable grounds to believe that he was then in danger," etc., thus clearly taking the instruction given out of the class of instructions condemned in the cases cited by the defendant.

The judgment is affirmed.